1
2
3
4
5
6
7
8
9            **UNITED STATES DISTRICT COURT**
10        **SOUTHERN DISTRICT OF CALIFORNIA**
11
12 | LEEDS LP,                              Case No. 08cv100 BTM (BLM)

13                  Plaintiff,     **ORDER RE CROSS-MOTIONS FOR**
                                 **SUMMARY JUDGMENT AND**
14     v.                            **MOTION TO AMEND COMPLAINT**

UNITED STATES OF AMERICA,
15
                   Defendant.
16

17       Plaintiff and Defendant have each filed motions for summary judgment on a variety

18 of claims [Docs. 58, 59].  Also pending is Plaintiff's motion to file a Second Amended

19 Complaint [Doc. 74].  For the following reasons, the Court **GRANTS** the United States's

20 motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment. The

21 Court **DENIES** Plaintiff's motion to file a Second Amended Complaint as moot.

22

23                     **I.  BACKGROUND**

24       This is a quiet-title suit challenging tax liens placed by the United States on real

25 property at 3207 McCall Street, San Diego, CA 92106 (the "McCall Property").  The Internal

26 Revenue Service ("IRS") placed liens on the property because Don and Susanne Ballantyne,

27 who owe the IRS substantial income taxes, are allegedly its true owners.  Plaintiff contends

28 that it is the only owner and that the Ballantynes have no interest in it.  This is the core

dispute in this case.

## 1.     The IRS Files Tax Liens Against Don and Susanne Ballantyne

Don and Susanne Ballantyne owe income taxes to the IRS.  Although they owe income taxes for several tax years, the tax years for which they owe the most money are 1985 and 1986.  They filed a petition with the United States Tax Court challenging notices of income tax deficiency sent by the IRS for those two years.  The court held a trial in May 1995, and on October 10, 1996, the court filed an opinion stating the Ballantynes owed deficiencies of $388,937.00 for 1985, and $931,970.00 for 1986.  On appeal, the Ninth Circuit affirmed the judgment of the Tax Court.

After trial, on June 30, 1997 the IRS made assessments against the Ballantynes for those two years in the amounts of $388,937.00 (1985) and $931,970 (1986).  Notice and demand for payment was made on the same day.[1]  The IRS has made other assessments against the Ballantynes: one on January 2, 1995 for $25,164.00, plus interest (1990 tax year) and the other on November 16, 1998 for $11,515.00, plus interest (1997 tax year).

On November 14, 1997, the IRS recorded with the San Diego County Recorder's office a Notice of Federal Tax Lien in the amount of $5,539,789.51 against the Ballantynes for tax years 1985 ($1,743,607.49) and 1986 ($3,796,182.02).  Several years later, on July 17, 2006, the IRS recorded another Notice of Federal Tax Lien against the McCall Property in the amount of $5,212,494.62, identifying Plaintiff Leeds as the nominee/alter ego of Susanne C. Ballantyne.  Plaintiff has now filed this quiet-title action to remove the lien.

## 2.     History of the McCall Property and Its Owners

Susanne Ballantyne's parents built the McCall Property around 1929 and they raised her there.  The Property was owned by the Susan T. Cramer Trust ("STC Trust"), named after Ms. Ballantyne's mother.  After her parents died, Ms. Ballantyne and her brother

---

[1]     There is a dispute regarding whether notices and demands regarding the assessments were proper.  The Court finds they were proper, as discussed in detail *infra*.

08cv100 BTM (BLM)

became the co-beneficiaries of the STC Trust. Her brother took his apportioned distribution of the STC Trust in 1979, leaving Ms. Ballantyne as its only trustee and beneficiary. The STC Trust still owned the McCall Property at that time.

In 1987, Susanne Ballantyne formed an intervivos trust, of which she was the sole settlor, trustee and beneficiary, called the Susanne C. Ballantyne Trust, and she placed the entire corpus of her mother's trust, including the McCall Property, into it. Then, on June 21, 1995, the STC Trust transferred legal title to the McCall Property to Leeds LP (the Plaintiff here) in exchange for a 99% limited partnership interest in Leeds. The STC Trust later transferred its 99% interest in Leeds to the Susanne C. Ballantyne Trust in July 1995. Leeds still holds legal title to the McCall Property.

Leeds was created in May 1995 by its 1% general partner, B&B Business Services, Inc. Soon thereafter, in June 1995 B&B withdrew as the general partner, and was replaced by Rhodes Investment Corporation. Rhodes is still the 1% general partner of Leeds. Rhodes itself was owned by the Susanne C. Ballantyne Trust; the trust was Rhodes's sole shareholder. And Susanne Ballantyne was Rhodes's president, secretary-treasurer, and director. Clark L. Ballantyne, her son, later took over her roles in Rhodes on November 26, 1997, a month after the Susanne C. Ballantyne Trust sold its interest in Rhodes to the Children's Trusts (defined *infra*).

To summarize the McCall Property's history up until this point, it was originally owned by Susanne Ballantyne's mother's trust, the STC Trust. The STC Trust was later placed in the Susanne C. Ballantyne Trust. The STC Trust then sold the property to Leeds, whose general partner was Rhodes. And Rhodes was owned by the Susanne C. Ballantyne Trust, and operated by Susanne Ballantyne herself. So, in effect, Susanne Ballantyne indirectly owned entities on both sides of the transaction: she indirectly owned the STC Trust, which sold the property, and also indirectly owned Leeds LP, which bought the property.

This complicated history continues. In January 1996, a limited partnership called Hemet C bought a 1% limited partnership interest in Leeds. About a year later, the Susanne C. Ballantine Trust transferred the remaining 98% limited partnership interest in Leeds to

3

Hemet C.  So, as of February 1997, Hemet C owned about 99% of Leeds as the limited partner, and Rhodes about 1% as general partner.

But who owns Hemet C?  Hemet C is a limited partnership.  Its 99% limited partners are trusts named after Don and Susanne Ballantyne's children, the Clark Lindsay Ballantyne Trust and the Laura Ballantyne Trust (collectively "Children's Trusts").  They each hold a 49.5% interest in Hemet C.  A company called Snow Valley Holdings, Inc. holds Hemet C's remaining 1% as the general partner.

Snow Valley, Hemet C's general partner, is a corporation whose shares are owned by the Children's Trusts.  So, the Children's Trusts are the 99% limited partners in Hemet C, and also own its 1% general partner.  At the time Snow Valley became the general partner of Hemet C in December 1995, Don and Susanne Ballantyne were among its officers and directors.  Don Ballantyne was a vice president and director, and Susanne Ballantyne was the secretary-treasurer and a director.  They resigned their positions in November 1997.

In summary, when Leeds purchased the McCall Property from the STC Trust, Leeds's 1% general partner was Rhodes (owned by the Susanne C. Ballantyne Trust) and its 99% limited partner was the Susanne C. Ballantyne Trust.  Although Rhodes retained its 1% general partnership interest, Hemet C purchased the 99% limited partnership from the Susanne C. Ballantyne Trust.  And Hemet C itself is owned by the Children's Trusts (limited partners) and Snow Valley (general partner), which at the time counted Don and Susanne Ballantyne among its officers and directors.

## II.  LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could

return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial.  *Id.* at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  *Celotex*, 477 U.S. at 314.  The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings."  *Anderson*, 477 U.S. at 256.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

### 1.    The Basis of the United States's Claimed Interest in the Property

In this quiet-title action, the Court must resolve the parties' competing claims against the McCall Property.  Plaintiff Leeds believes that the lien imposed by the IRS is improper because the IRS seeks assets of the Ballantynes, and the Ballantynes have no interest in Leeds or the McCall Property.  The United States claims that Leeds is merely the nominee of the Ballantynes, and that they are its true owners.

"A nominee is one who holds bare legal title to property for the benefit of another."  *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001)  (citing *Black's Law Dictionary* (7th ed. 1999)).  "Property held by a nominee is subject to a tax lien attaching to the property

of the true owner." *United States v. Beretta*, 2008 WL 4862509, at *7 (N.D. Cal. 2008) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 351 (1977)); *see also* 26 U.S.C. § 6321 (If a person fails to pay federal tax after a demand, a lien automatically attaches to "all property and rights to property, whether real or personal, belonging to such person."). Nominee claims require two levels of analysis, one applying state law and the other applying federal law.  A court must "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *United States v. Craft*, 535 U.S. 274, 278 (2002) (internal quotation marks and citations omitted).

In the first step, a court must determine whether a purported true owner of the property has a state-law interest in the property.  *United States v. Overman*, 424 F.2d 1142, 1144 (9th Cir. 1970).  The purported owner must have an interest in the property on or after the date of the assessment.  *See* 26 U.S.C. § 6322; *Rice Inv. Co. v. United States*, 625 F.2d 565, 568 (5th Cir. 1980) (citing *Glass City Bank v. United States*, 326 U.S. 265 (1945)).  Plaintiff challenges primarily this first step, arguing that the Ballantynes have no state-law property interest in the McCall Property.  Plaintiff addresses several forms of state-law ownership, arguing that each is inapplicable or otherwise foreclosed to the United States.  The Court addresses each of them below.

**2.      State-Law Property Rights**

A.      Nominee Ownership

Plaintiff first claims that California does not recognize a nominee theory of ownership.  Although the parties agree that federal law recognizes a nominee theory of ownership, they dispute whether California law recognizes it.  The Court holds that it does.

Several California courts have discussed or mentioned nominee ownership.  *Lewis v. Hankins*, 214 Cal. App. 3d 195, 201–02 (1989) (affirming trial court judgment which allowed creditor to levy and sell real property owned by debtor's nominees because debtor

was beneficial owner); *Parkmerced Co. v. City and County of San Francisco*, 140 Cal. App. 3d 1091, 1095 (1983) (noting that one general partner held real property as nominee for partnership); *Baldassari v. United States*, 79 Cal. App. 3d 267, 272 (1978) ("The validity of the tax liens depends upon whether plaintiffs are the bona fide owners of the properties or are only nominees."); *Baumann v. Harrison*, 46 Cal. App. 2d 84, 91 (1941) (stating that "appellant took title as the nominee of [another party] but did not assume or agree to pay the indebtedness secured by the deed of trust"); *see also McColcan v. Walter Magee, Inc.*, 172 Cal. 182, 186 (1916) (alluding to nominee ownership and stating "one cannot by any disposition of his own property put the same or the income thereof beyond the reach of his creditors, so long as he himself retains the right to receive and use it").  And federal courts have said that California recognizes nominee ownership.  *United States v. Dubey*, 1998 WL 835000, at *98-7055 (E.D. Cal. Oct. 21, 1998) ("Under the 'nominee' doctrine in California, 'a person cannot place his property . . . beyond the reach of his creditors so long as he himself retains the right to . . . use it.'") (quoting *In re Camm's Estate*, 76 Cal. App. 2d 104 (1946)); *see Cal Fruit Int'l, Inc. v. Spaich*, 2006 WL 2711664, at *4 (E.D. Cal. September 21, 2006).

Although California law recognizes the theory of nominee ownership, it appears that no California court has ever identified the factors involved in a nominee analysis.  *Cal Fruit*, 2006 WL 2711664, at *4 ("There appear to be no reported California decisions which address the issue of what factors are relevant in determining whether an individual is a nominee of a taxpayer.")  In the absence of state-law guidelines, federal courts in California have used the guidelines of federal common law.  *E.g., United States v. Beretta*, 2008 WL 4862509, at *7 (N.D. Cal. Nov. 11, 2008); *United States v. Lang*, 2008 WL 2899819, at *5 (S.D. Cal. July 25, 2008); *Sequoia Prop. & Equip. Ltd. P'ship v. United States*, 2002 WL 31409620, at *12 (E.D. Cal. Sept. 19, 2002).   Federal courts in other states use the same approach. *E.g., Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001) ("A nominee is one who holds bare legal title to property for the benefit of another.  Under Missouri law, one who holds such title has no actual interest in the property, which remains with the beneficial

owner.  No Missouri court has delineated a precise test for determining whether a property holder is a nominee. Missouri courts have, however, provided a test for determining whether a conveyance is fraudulent. In such instances, Missouri courts look to "badges of fraud" . . . .  These elements parallel those we have looked to in determining whether a property holder is in fact merely a nominee. . . .  We think that faced with a similar situation, a Missouri court would likely apply this body of law.").

But at this stage, it does not matter what the specific factors of nominee ownership are.  Plaintiff does not argue that the United States has failed to produce evidence showing nominee ownership.  Instead, it only argues that nominee ownership does not exist under California law.  And because the Court holds that it does, that ends the inquiry.  The Court need not analyze whether there is a genuine dispute regarding the nominee factors.

Plaintiff argues that because the nominee doctrine is not fleshed out in California, the Court should not borrow from federal common law for its analysis.  Instead, the Court should apply an analogous California doctrine, the law of resulting trusts, which has been fleshed out.  In support of this argument, Plaintiff cites two cases from other circuits.  The first is *Spotts v. United States*, 429 F.3d 248, 253 (6th Cir. 2002), also a federal tax-lien case.  The district court, in applying the nominee theory, did not look to Kentucky nominee law because its nominee law is unclear.  *See id.* at 252–53.  Instead, it looked to the law of other courts.  *Id.* at 253.  The Sixth Circuit reversed, holding that even though Kentucky nominee law was unclear, the district court should have applied an analogous Kentucky state-law doctrine, that of constructive trust.  *See id.* at 253.  The second case, *Holman v. United States*, 505 F.3d 1060 (10th Cir. 2007), has a very similar holding.  The district court had borrowed another jurisdiction's law regarding nominee ownership, and the Tenth Circuit remanded the case, requiring the IRS to "identify the theory or theories under which it asserts that Mr. Holman has a beneficial interest in the Centerville property under Utah law."  *Id.* at 1068.

These two cases are not binding precedent on this Court.  And as the Court has already explained, California law does recognize the nominee theory of ownership.  It even gives some general guidance on how to apply it.  *See Baumann*, 46 Cal. App. 2d at 91–92

08cv100 BTM (BLM)

(taking title to property but not assuming debts, control and possession of the property, and receiving rents from property contributed to nominee status); *Lewis*, 214 Cal. App. 3d at 201 (analysis focuses on who is the beneficial owner).  The Court can supplement these general guidelines with federal common law as many other courts in this circuit have done.  *E.g., Lang*, 2008 WL 2899819, at *5 (S.D. Cal. July 25, 2008).

Plaintiff's motion for summary judgment on the issue of whether the United States can use a nominee theory of ownership is denied.

B.    Resulting Trust

Plaintiff also claims that the United States cannot use the theory of resulting trust.  "A resulting trust arises from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest."  11 Witkin, *Summary of Cal. Law*, Trusts § 297 (9th ed. 1990).  It "is based on the manifestation of the person creating it." *Majewsky v. Empire Constr. Co., Ltd.*, 2 Cal. 3d 478, 485 (1970).  "The trust arises because it is the natural presumption in such a case that it was their intention that the ostensible purchaser should acquire and hold the property for the one with whose means it was acquired."  *Id.*

Plaintiff Leeds assumes (for the purposes of summary judgment only) that when it purchased the McCall Property from the STC Trust in 1995, a resulting trust was created, with Leeds as the trustee and Susanne Ballantyne as the beneficiary.  But Plaintiff argues that Susanne Ballantyne sold or repudiated her interest in the resulting trust when Hemet C purchased 99% of Leeds.  (Rhodes, a corporation owned by the Susanne C. Ballantyne Trust, retained the remaining 1% of Leeds as general partner.)

Resulting trusts can be repudiated.  *In re Estate of Yool*, 151 Cal. App. 4th 867, 875 (2007) (repudiation occurs when demand "has been made upon the trustee and the trustee refuses to account or convey").  Plaintiff claims that Susanne Ballantyne repudiated her interest in the resulting trust when Hemet C purchased most of Leeds.  But it is generally the

trustee that must repudiate the trust.[2]  *See, e.g., Yool*, 151 Cal. App. 4th at 875.  And in this case, the trustee of any resulting trust would be Plaintiff.  Yet Plaintiff has failed to produce any evidence showing that it repudiated a resulting trust.  A mere change in Plaintiff's ownership, especially when the new owner is a partnership largely owned by the Ballantyne's Children's Trusts and controlled by a corporation which counts the Ballantynes among its officers and directors, does not qualify as repudiation.  Plaintiff itself, even with new owners, could still hold the McCall Property in trust for the benefit of the Ballantynes.

Moreover, Plaintiff's general partner, Rhodes, was never replaced.  Hemet C only bought the limited partnership interest, leaving Rhodes as Plaintiff's general partner.  And the Ballantynes owned and controlled Rhodes until 1997.  Given the Ballantynes' continued interest and control of Plaintiff through Rhodes and the lack of any act of repudiation, the Court denies summary judgment for Plaintiff on the repudiation issue.

Plaintiff also argues that Susanne Ballantyne sold her interest in the resulting trust when Hemet C purchased all of the Susanne C. Ballantyne Trust's interest in Plaintiff.  This argument also lacks merit.  Plaintiff has not produced any documents referencing the sale of a resulting trust.  And although the Susanne C. Ballantyne Trust sold its interest in Plaintiff, Susanne C. Ballantyne herself may still be the beneficiary of a resulting trust.  She sold her ownership stake in Plaintiff, not in the resulting trust.  Moreover, as discussed above, the Ballantynes still owned Plaintiff's general partner, even after the sale.

But even if there was a repudiation, taxpayers cannot simply disclaim interests in property to avoid tax liens.  *See Drye v. United States*, 528 U.S. 49, 60–62 (1999) (holding that debtor's disclaiming of inheritance according to state law, which generally prohibits creditors from reaching the inheritance under state law, did not defeat federal tax liens); *United States v. Mitchell*, 403 U.S. 190, 204 (1971) (holding wife's renunciation of interest in community property under state law could not avoid attachment of federal tax lien to property).  Plaintiff's interest in the Fourth Avenue Property would therefore survive any

---

[2]  The Court is unable to find any cases where the beneficiary has repudiated a trust. That is presumably because the resulting trust is generally used to protect the beneficiary's interest in the property.  *See* 11 Witkin, *Summary of Cal. Law*, Trusts § 297 (9th ed. 1990)

08cv100 BTM (BLM)

purported repudiation.

Lastly, Plaintiff is wrong that the four-year statute of limitations for a resulting trust claim has run. Plaintiff argues that a party must sue within four years of repudiation, and since the purported repudiation happened over four years before the United States filed suit, the resulting trust claim has expired. But "[t]he mere lapse of time, without repudiation, does not affect the beneficiary's rights" under a resulting trust. *Yool*, 151 Cal. App. 4th at 876. Here, there has been no repudiation, so Plaintiff has not shown anything beyond a "mere lapse of time." *Id.* And even if the statute of limitations has run, state-law statutes of limitations are "inapplicable to bar the claims of the United States." *Bresson v. Commissioner of Internal Revenue*, 213 F.3d 1173, 1175 (9th Cir. 2000).

For these reasons, the Ballantynes may have had an interest in the McCall Property on the date of the assessment, and there is a genuine dispute regarding the existence of a resulting trust. But there is no genuine dispute regarding repudiation, and the Court grants the United States motion for summary adjudication on the repudiation issue.

C.   The United States May Use a Fraudulent Transfer Theory of Ownership

Plaintiff believes that the United States cannot use a fraudulent transfer theory to assert an interest in the McCall Property. Plaintiff gives two reasons: (1) the 1997 Notice of Federal Tax Lien did not mention fraudulent transfer, and (2) the United States has not pled a fraudulent transfer claim in its Answer or as a counterclaim.[3]

Plaintiff cites no case law in support of its arguments. The United States did not have to specifically plead, or give notice of, a fraudulent transfer claim. The United States has given notice that it proceeds under a nominee theory. The United States can impose a lien on property if the owner of the property is the nominee of the taxpayer. *See* 26 U.S.C. §§ 6321; *see G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977) (holding that

---

[3] Plaintiff originally had a third argument, claiming that the United States's fraudulent transfer claim had been extinguished. Plaintiff has withdrawn this argument based on *Bresson v. Commisioner of Internal Revenue*, 213 F.3d 1173 (9th Cir. 2000), which held that the extinguishment provisions of the California Uniform Fraudulent Transfer Act are inapplicable to actions by the IRS to collect income taxes.

08cv100 BTM (BLM)

§ 6321 allows the government to impose a lien on property in the hands of a third party straw man).  And although the nominee theory requires showing some type of interest in property based on a state-law theory, there is no authority supporting Plaintiff's belief that each state-law theory must be specifically pled.  *Cf. In re Krause*, 386 B.R. 785, 833–34 (Bankr. D. Kan. 2008), *aff'd*, 2009 WL 5064348 (D. Kan. Dec. 16, 2009) (distinguishing between bringing direct fraudulent conveyance action as a stand alone action, and using fraudulent conveyance law as the basis for finding a state-law interest under a nominee claim).  In the absence of support for Plaintiff's argument, the Court holds that the United States has adequately pled its nominee claim and may use a fraudulent transfer theory, either under California common law or statutory law, to show that the Ballantynes have an interest in the Fourth Avenue Property and Plaintiff is merely their nominee.

D.    The United States May Use an Alter-Ego Theory of Ownership

In its reply brief, Plaintiff argues that the United States cannot use an alter-ego theory of ownership for two reasons.[4]  First, Plaintiff argues that an alter-ego claim has not been pled.  The Court rejects this argument for the same reason it rejected Plaintiff's fraudulent-transfer arguments.  The United States only had to plead a nominee claim, not the several theories of state-law property rights that might support such a claim.

Second, Plaintiff argues that the United States has said it will not assert an alter-ego claim, and should be precluded from doing so.  The United States, in its proposed pretrial order, said that it "is not asserting claims under the theory of alter ego or under the California Fraudulent Conveyance Act."  But the United States has consistently maintained it is asserting a nominee claim, which can use a variety of state-law claims as support.  *See, e.g., Dalton v. Comm'r of Internal Revenue*, 2008 WL 2651424, at *8 (U.S. Tax Ct. 2008) (In actions involving nominee claims, "various theories have been used to support the existence

---

[4]    Normally, courts should only address arguments first raised in a reply if the opposing party has had the chance to respond to them.  *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040–41 (9th Cir. 2003).  Nevertheless, since the Court rejects Plaintiff's arguments, the Court finds it unnecessary to have the United States respond.

of an interest under State law, depending upon the jurisdiction and particular facts involved. Examples include resulting trust doctrines, constructive trust principles, fraudulent conveyance standards, and concepts drawn from State jurisprudence on piercing the corporate veil."). Although the United States said it was not asserting alter-ego or California Fraudulent Conveyance Act claims, it may still use alter ego and fraudulent-transfer theories to show a property interest under state law. There is a distinction between asserting an alter-ego or fraudulent-transfer claim directly, and using those theories to support a nominee claim. The United States therefore is not precluded from using the alter-ego theory to support its nominee claim.

### E.    The Constructive Trust Theory of Ownership

Plaintiff argues for the first time in its reply brief that the United States may not use a theory of constructive trust in support of its nominee claim. The Court will not grant summary judgment on the constructive-trust theory until the United States has had an opportunity to respond. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040–41 (9th Cir. 2003) (court may not grant summary judgment on claims only raised in reply unless opposing party has opportunity to respond).

Under California law, a constructive trust is an equitable remedy, not a substantive claim. *Batt v. City and County of San Francisco*, 155 Cal. App. 4th 65, 82 (2007) ("A constructive trust is not an independent cause of action but merely a type of remedy, and an equitable remedy at that.") (internal quotations marks and citations omitted); 11 Witkin, *Summary of Cal. Law*, Trusts § 305 (9th ed. 1990). In order to establish a constructive trust, the purported beneficiary of the trust must have a substantive right to receive the property. *United States v. Pegg*, 782 F.2d 1498, 1500 (9th Cir. 1986) ("Because a constructive trust is a specific remedy, the plaintiff must have some interest that can be returned to it."). Whether or not the Ballantynes are beneficiaries, and whether Plaintiff is the trustee, of a constructive trust is not properly before the Court on this motion and may be argued after the trial.

1  **3.    The United State May Address Adequacy of Consideration and the Ballantynes'**

2  **Intent**

3       Plaintiff argues that the United States cannot rely on lack of consideration or intent in

4  proving its nominee claim.  The Court rejects this argument, as it is entirely without merit.

5  Plaintiff cites no relevant case law supporting its argument.  If adequacy of consideration and

6  intent are relevant to establishing the Ballantynes' alleged state-law interest in the McCall

7  Property, or if they are relevant to the nominee factors, the United States may address them.

8       Regarding other factors that are part of the nominee analysis, it appears that the

9  parties recognize that different factors are appropriate depending on the facts of each case,

10  and that there is no fixed number of nominee factors.  When this case goes to trial, the

11  parties can make arguments about the relevant nominee factors.

12

13  **4.    There Is a Genuine Dispute of Material Fact About Whether Plaintiff Was a**

14  **Subsequent Purchaser**

15       Under 26 U.S.C. § 6323, tax liens are not effective against third-party purchasers of

16  property until the IRS has filed notice of the lien.  *Gorospe v. Comm'r of Internal Revenue*,

17  451 F.3d 966, 967 (9th Cir. 2006); 26 U.S.C. § 6323(a).   Purchasers must have paid

18  "adequate and full consideration" for the property, and must not have "actual notice" of the

19  lien.  26 U.S.C. § 6323(h)(6).

20       Plaintiff argues that the liens are ineffective against it because they were filed *after* it

21  got legal title to the McCall Property.  The United States does not dispute the timing of the

22  notice, but it argues that the statutory lien is effective against Plaintiff as the Ballantyne's

23  nominee.

24       The Court agrees with the United States.  If the United States establishes that Plaintiff

25  is the Ballantyne's nominee, then Plaintiff is not entitled to the protections of 26 U.S.C.

26  § 6323(a).  *See United States v. Clark*, 2007 WL 3347515, at *1 (M.D. Fla. Sept. 12, 2007)

27  ("April E. Clark holds the subject property as a nominee of Alphonso J. Clark and thus is not

28  entitled to the protection afforded by 26 U.S.C. § 6323.").  Moreover, Plaintiff only gets the

protections of § 6323 if it meets the definition of purchaser.  And a purchaser must have paid "adequate and full consideration" for the property.  26 U.S.C. § 6323(h)(6).  So if the United States shows that Plaintiff did not pay full consideration for the McCall Property, this provision will not protect it.  The Court holds that on the present record, there is a genuine dispute regarding whether Plaintiff is a subsequent purchaser under § 6323.

        A.    <u>Rhodes And Hemet C Are Not Subsequent Purchasers</u>

Plaintiff also argues that its two partners, Rhodes and Hemet C, are not subject to the tax lien.  But § 6323 only applies to purchasers of property who paid full consideration without actual notice.  *Id.*  Rhodes and Hemet C did not buy the McCall Property; Plaintiff did. They only purchased an interest in Plaintiff, which is not covered by § 6323.  *See id.* at 6323(h)(6).  Moreover, Rhodes and Hemet C had actual notice of the assessments. Susanne Ballantyne herself controlled Rhodes at the time it purchased an interest in Plaintiff. And in January 1996, when Hemet C purchased an interest in Plaintiff, the Ballantynes held director and officer positions in Hemet C's general partner.  Because the Ballantynes had actual notice of the assessments before January 1996 (they challenged the assessments in July 1994), that knowledge is imputed to Rhodes and Hemet C.  *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 911 (9th Cir. 2008) ("Generally, the knowledge of a corporate officer within the scope of his employment is the knowledge of the corporation.") (quoting *Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App. 2d 242  (1966)).  Section 6323 therefore does not apply to Rhodes and Hemet C because they were not purchasers and they had actual knowledge of the assessments.

The Court grants the United States's motion for summary adjudication and finds that Rhodes and Hemet C are not subsequent purchasers under § 6323.

**5.    Notice of the Assessment and Demand for Payment Was Proper**

Plaintiff challenges the tax assessments against the Ballantynes because of alleged procedural defects.  Plaintiff, however, lacks standing to challenge the assessments.  The

1    assessment is against the Ballantynes, not Plaintiff.   And a "third-party, non-delinquent

2    taxpayer" may not attack a tax assessment based on procedural grounds.   *See Graham v.*

3    *United States*, 243 F.2d 919, 922 (9th Cir. 1957) ("We believe that only the taxpayer may

4    question the assessment for taxes, and assert noncompliance by the Commissioner in

5    sending the taxpayer a notice of deficiency by registered mail."); *Macatee, Inc. v. United*

6    *States*, 214 F.2d 717, 720 (5th Cir. 1954) ("If there is cause for complaint for failure to give

7    the notice required by 26 U.S.C.A. [6303], that cause belongs to the taxpayer.").   Plaintiff

8    cites no cases contradicting the holding in *Graham*.   But even if Plaintiff did have standing,

9    the evidence establishes that there were no procedural defects in the assessments.

10         The IRS assessed taxes against the Ballantynes several times between 1995 and

11   1998.[5]   In order for those assessments to be valid, the IRS must send notice of the

12   assessment and demand for payment within 60 days to the taxpayer's dwelling, place of

13   business, or last known address.   26 U.S.C. § 6303(a).   There is no requirement that the

14   taxpayer actually receive the notice, only that it is sent to the taxpayer's last-known address.

15   *United States v. Zolla*, 724 F.2d 808, 810 (9th Cir. 1984).   Plaintiff argues that the

16   Ballantynes have no recollection of receiving notices of the assessment or demands for

17   payment, and that there is no evidence establishing that they received notice.   Because

18   notice and demand for payment are conditions precedent for the creation of a tax lien, *see*

19   26 U.S.C. § 6321, if notice was defective, then the liens would be invalid.

20         But here there was no defect.   The United States has submitted and properly

21   authenticated four Form 4340's, which show that the IRS properly sent notice and demand

22   for payment.   *See Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam)

23   ("Form 4340 is probative evidence in and of itself and, in the absence of contrary evidence,

24   _____

25         [5]  Plaintiff objects to evidence regarding the tax assessments as irrelevant, hearsay,
     and lacking foundation.   The Court overrules the objections.   The evidence regarding the
26   assessments are public records attached to a declaration by John Black, an IRS Revenue
     Officer who is assigned to the Ballantynes case and who reviewed their IRS file.   They are
27   obviously relevant to the question of whether the assessments were made, Mr. Black's
     declaration establishes a proper foundation, and they fall within the public records hearsay
28   exception.   Fed. R. Evid. 803(8); *see Hughes v. United States*, 953 F.2d 531, 539–40 (9th
     Cir. 1991).

shows that notices and assessments were properly made."). The Form 4340's all state that on a particular date, the IRS sent a "statutory notice of balance due." (*See* Black Decl. Exs. A–D.) Although the Ballantynes state that they have no recollection of receiving the notice of tax assessment, that is insufficient to raise a genuine issue as to whether notice was sent. *Id.* (declaration by taxpayers that they never received notice and demand "does not show the notice was not sent" and "fails to raise a genuine issue of material fact"). *Hansen* squarely rejected the same argument Plaintiff makes here.

Plaintiff relies on several Ninth Circuit cases that precede *Hansen* to argue that Form 4340, or some other evidence, must show the address to which the IRS sent a demand for payment. In those cases, the Ninth Circuit noted that the Form 4340 contained the taxpayer's correct address. *See, e.g., United States v. Zolla*, 724 F.2d 808, 810 (9th Cir. 1984). The Form 4340 submitted here does not show the address to which the demands were mailed. But *Hansen* does not require that a Form 4340 state the address. The presumption that the IRS sent a demand arises when the Form 4340 notes that demand was sent. *See United States v. Scott*, 290 F. Supp. 2d 1201, 1206 (S.D. Cal. 2003) (citing *Hansen*, 7 F.3d at 138) ("Where a Form 4340 indicates that notice and demand were timely given, it is sufficient in the absence of contrary evidence to establish that such notice and assessment were made.") And here, the Form 4340's note exactly that.

The Court holds that there is not a genuine issue of fact regarding whether the IRS sent the notice and demand. The evidence establishes that notice and demand was proper under 26 U.S.C. § 6303(a). Because Plaintiffs lack standing and the notices and demands were proper, the Court grants the United States's motion for summary adjudication on the issue of proper notice and demand. Plaintiffs cannot challenge this at trial.

**6.    Plaintiff's Equitable Defenses**

Actions to levy property subject to a tax lien generally must be brought within ten years of the original assessment. 26 U.S.C. § 6502(a)(1). Although over ten years passed without the United States levying the McCall Property, the United States argues that the

1  statute of limitations was tolled by the Ballantyne's submission of an offer in compromise

2  ("OIC") to settle their tax liability.   While an OIC is pending, the applicable statute of

3  limitations is sometimes tolled.   *See United States v. McGee*, 993 F.2d 184, 186 (9th Cir.

4  1993) (citing *United States v. Holloway*, 798 F.2d 175, 176 (6th Cir. 1986).   In response,

5  Plaintiff asserts that the United States is equitably estopped from arguing tolling of the statute

6  of limitations.   Plaintiff points to misconduct and delay in the OIC process as grounds for

7  estoppel. The United States moves for summary adjudication on Plaintiff's estoppel claim.[6]

8

9      A.    Motion for Leave to File Second Amended Complaint

10      The First Amended Complaint does not plead equitable estoppel.  Seizing on this, the

11  United States argues that Plaintiff cannot assert equitable estoppel at trial.  So Plaintiff has

12  filed a motion for leave to file a Second Amended Complaint, which adds the estoppel claim.

13  The Court denies Plaintiff's motion because, as set forth below, Plaintiff cannot establish

14  estoppel.  *See Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002) (court may deny

15  amendment based on futility).

16

17      B.    Plaintiff Cannot Prove Equitable Estoppel

18      The elements of equitable estoppel are "(1) [t]he party to be estopped must know the

19  facts; (2) he must intend that his conduct shall be acted on or must so act that the party

20  asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant

21  of the true facts; and (4) he must rely on the former's conduct to his injury." *Watkin v. United*

22  *States Army*, 875 F.2d 699, 709 (9th Cir. 1989) (citing *United States v. Wharton*, 514 F.2d

23  406, 412 (9th Cir. 1975).  When a party asserts equitable estoppel against the United States,

24  two more elements must be met: (1) "affirmative conduct going beyond mere negligence;"

25  and (2) the "government's act will cause a serious injustice and the imposition of estoppel

26  will not unduly harm the public interest." *Purcell v. United States*, 1 F.3d 932, 932, 940 (9th

27

28        [6]  The United States also moved for summary adjudication on Plaintiff's purported
laches defense, but Plaintiff states that it is not asserting a laches defense.

Cir. 1993) (quoting *S & M Inv. Co. v. Tahoe Regional Planning Agency*, 911 F.2d 324, 329 (9th Cir. 1990)).  The two additional elements are threshold requirements and the Court should consider them first.  *Purcell v. United States*, 1 F.3d 932, 939 (9th Cir. 1993).

Unreasonable delay and errors in the OIC process do not establish "affirmative conduct going beyond mere negligence," which is a necessary element of equitable estoppel. *Watkin*, 875 F.2d at 709.  At most, Plaintiff's evidence would show that the IRS was negligent in handling Plaintiff's case, and negligence is insufficient.  *Id.*  Plaintiff also cannot show that the "imposition of estoppel will not unduly harm the public interest."  *Id.*  In fact, permitting Plaintiff to assert equitable estoppel might frustrate the legitimate attempts of the IRS to collect on taxes owed by the Ballantynes.

Not only can Plaintiff not meet the special requirements for estoppel claims against the government, Plaintiff cannot meet the traditional elements of estoppel, which deal with detrimental reliance on misrepresentations of fact.  There must be some "affirmative misrepresentation or affirmative concealment of a material fact by the government."  *United States v. Ruby Co.*, 588 F.2d 697, 703–04 (9th Cir. 1978). Here, there is simply no misrepresentation or concealment that Plaintiff relied on to its detriment.

In fact, the Ninth Circuit has already rejected a very similar claim by a taxpayer in *United States v. McGee*, 993 F.2d 184(9th Cir. 1993)  Although the taxpayer in that case did not raise equitable estoppel specifically, he argued that because the IRS had abandoned his OIC, tolling should have stopped.  The Ninth Circuit disagreed, holding that tolling only stops when the OIC is "terminated, withdrawn or formally rejected by the government."  *Id.* at 186. The Ninth Circuit emphasized that the taxpayer "was also not left unprotected; he could have withdrawn his offer at any time" and restarted the statute of limitations clock.  *Id.  McGee* stands for the proposition that if consideration of the OIC takes too long, the taxpayer has a simple remedy: withdraw the OIC.  The Ballantynes chose instead to see the OIC process to its conclusion, and even appealed the IRS's rejection of their OIC.  If they wanted to restart the clock, they could have.

Therefore, the Court enters summary adjudication against Plaintiff on its equitable

estoppel claim.

### 7.      The Statutes of Limitations on the Tax Assessments Has Not Expired

Plaintiff wants to argue at trial that the statute of limitations on collection of the Ballantynes' tax liabilities has expired.  The United States moves for summary judgment on this issue, arguing that the evidence proves the statute of limitations has not run.

The statute of limitations on collecting tax liabilities is ten years, starting on the day of the assessment.  26 U.S.C. § 6502.  Here, the tax assessments were made in January 1995, June 1997, and November 1998.  The parties agree the statute of limitations on all three assessments would have already expired absent tolling.

The statute of limitations on tax collection can be tolled.  When an OIC is pending, the statute of limitations is tolled until the OIC is "terminated, withdrawn, or formally rejected by the government."  *United States v. McGee*, 993 F.2d 184, 186 (9th Cir. 1993) (citing *United States v. Holloway*, 798 F.2d 175, 176 (6th Cir. 1986).  But due to changes in the law, tolling during the pendency of an OIC did not apply from December 21, 2000 through March 8, 2002.  *See Staso v. United States*, 538 F. Supp. 2d 1335, 1347 (D. Kan. 2008) (discussing changes to law regarding tolling during OIC process).

Here, the Ballantynes submitted an OIC with respect to the assessments made in 1995, 1997, and 1998.  The IRS accepted the OIC for processing on October 24, 2000, which begins the tolling period.  *See United States v. Bourger*, 2008 WL 4424810, at *3 (D.N.J. Sept. 24, 2008) ("An offer to compromise becomes pending when it is accepted for processing.") (quoting I.R.S. Revenue Procedure 2003–71 (2003).  On October 23, 2007, the IRS Appeals Office finally rejected the Ballantyne's amended OIC, which terminated the OIC process.  Although the OIC was pending during this entire time, there was no tolling from December 21, 2000 through March 8, 2002.  *Staso*, 538 F. Supp. 2d at 1347.  So to find the total number of days tolled, the Court starts with the total number of days the OIC was pending and subtracts the days that tolling did not apply: 2555 minus 443 equals 2,112 days.  The Court adds 2,112 days, plus the normal 10-year limitations period, to the original

expiration dates of the three assessments: January 2, 1995 assessment expires on or about October 15, 2010; June 30, 1997 assessment expires on or about April 12, 2013; November 16, 1998 assessment expires on or about August 28, 2014.

None of the statutes of limitation for the three tax assessments have expired.  Plaintiff does not dispute these dates, but instead argues that the United States is equitably estopped from asserting tolling.  The Court has already rejected that argument.  Plaintiff also argues that tolling is only available if the OIC is considered in due course.  But Plaintiff relies on a case in which the specific tolling agreement between the IRS and the taxpayer required the IRS to review the OIC in "due course."  *United States v. Cooper-Smith*, 310 F. Supp. 479, 482 (E.D.N.Y. 1970).  Here, there is no similar language in the Ballantynes' OIC.

Plaintiff has failed to show a disputed fact and the Court enters summary adjudication against Plaintiff on the statute of limitations issue.

**8.      Plaintiff Cannot Limit the Value of the Tax Lien**

Plaintiff argues that if it loses this quiet title action, the Court should limit the value of the tax lien against the McCall Property to the property's value on the date Plaintiff got title. Plaintiff first raised this argument in its Addendum to the Pretrial Order.  It has not been pled.

Moreover, Plaintiff gives no support for its argument.  It only cites California's Uniform Fraudulent Transfer Act, which states that if a creditor succeeds in a fraudulent transfer action, it may get a judgment against transferees "equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require."  Cal. Civ. Code § 3439.08(c).  First, this provision only addresses claims made under California's fraudulent transfer law, not nominee claims, which is what the United States asserts here.  Second, the provision only applies when the creditor seeks a monetary judgment against a *transferee* of the avoided transfer.  *See id.*  It does not apply when the creditor seeks to attach the property or only seeks to avoid the transfer and obtain relief directly from the debtor.  *See id.*

The Court enters summary adjudication in favor of the United States on the issue of limiting the value of the tax lien.

08cv100 BTM (BLM)

1

### IV.  CONCLUSION

The Court **GRANTS** the United States's motion for summary judgment [Doc. 58].  The Court grants summary adjudication in favor of the United States on the following claims and issues: equitable estoppel, statute of limitations, proper notice and demand,  Rhodes' and Hemet C's status as subsequent purchasers, repudiation of a resulting trust, and limiting the value of the tax lien.  The Court, however, holds that there is a genuine dispute of material fact regarding Plaintiff's status as a subsequent purchaser.

The Court **DENIES** Plaintiff's motion for summary judgment in its entirety [Doc. 59]. The Court **DENIES as moot** Plaintiff's motion for leave to file a Second Amended Complaint [Doc. 74].

**IT IS SO ORDERED.**

DATED:  August 5, 2010

Honorable Barry Ted Moskowitz
United States District Judge

08cv100 BTM (BLM)